Steve W. Berman (*pro hac vice* to be filed)
*steve@hbsslaw.com*
HAGENS BERMAN SOBOL SHAPIRO LLP
1301 Second Avenue, Suite 2000
Seattle, WA 98101
Telephone: (206) 623-7292
Facsimile: (206) 623-0594

Christopher R. Pitoun (SBN 290235)
*christopherp@hbsslaw.com*
HAGENS BERMAN SOBOL SHAPIRO LLP
301 N. Lake Avenue, Suite 920
Pasadena, CA 91101
Telephone: (213) 330-7150
Facsimile: (213) 330-7152

*Attorneys for Plaintiffs*
[Additional counsel listed on signature page]

## UNITED STATES DISTRICT COURT

## CENTRAL DISTRICT OF CALIFORNIA

## SOUTHERN DIVISION

| | |
|---|---|
| NICOLE THORNHILL, JANET O'BRIEN, and DAVID SHAPIRO, individually and on behalf of all others similarly situated, | No. |
| | **CLASS ACTION COMPLAINT** |
| Plaintiffs, | |
| v. | **JURY TRIAL DEMANDED** |
| HYUNDAI MOTOR COMPANY, HYUNDAI MOTOR AMERICA, KIA MOTORS CORPORATION, and KIA MOTORS AMERICA, INC., | |
| Defendants. | |

010789-11/1426138 V1

1
2

# TABLE OF CONTENTS

**Page**

I.    INTRODUCTION ........................................................................................ 1

II.   JURISDICTION AND VENUE .................................................................. 3

III.  THE PARTIES ........................................................................................... 4

    A.    Plaintiffs ........................................................................................... 4

    B.    Defendants ......................................................................................... 7

IV.   FACTUAL ALLEGATIONS ..................................................................... 9

    A.    The Engine Defect afflicts numerous engine platforms. ................. 9

    B.    The Engine Defect results in a serious risk of spontaneous
        fires across multiple models and years. ......................................... 13

    C.    Defendants issue piecemeal, inadequate, and incomplete
        recalls. ............................................................................................ 19

    D.    Defendants' pre-sale durability testing ......................................... 28

V.    CLASS ALLEGATIONS ......................................................................... 30

VI.   TOLLING OF STATUTES OF LIMITATIONS ...................................... 33

    A.    Discovery Rule Tolling .................................................................. 33

    B.    Fraudulent Concealment Tolling ................................................... 33

    C.    Estoppel .......................................................................................... 34

VII.  CALIFORNIA LAW APPLIES TO THE CLAIMS OF THE
      NATIONWIDE CLASS ........................................................................... 34

VIII. CLAIMS ALLEGED ............................................................................... 35

FIRST CAUSE OF ACTION  VIOLATIONS OF CALIFORNIA'S
      CONSUMER LEGAL REMEDIES ACT  ("CLRA") (Cal. Civ.
      Code § 1750, *et seq.*) (on behalf of the Nationwide Class or,
      alternatively, the California Class) ....................................................... 35

CLASS ACTION COMPLAINT

010789-11/1426138 V1

SECOND CAUSE OF ACTION  VIOLATIONS OF THE CALIFORNIA
UNFAIR COMPETITION LAW (Cal. Bus. & Prof. Code § 17200)
(on behalf of the Nationwide Class or, alternatively, the California
Class) ................................................................................................... 37

THIRD CAUSE OF ACTION  VIOLATION OF CALIFORNIA FALSE
ADVERTISING LAW (Cal. Bus. & Prof. Code § 17500, *et seq.*)
(on behalf of the Nationwide Class or, alternatively, the California
Class) ................................................................................................... 39

FOURTH CAUSE OF ACTION  VIOLATION OF THE SONG-
BEVERLY ACT – BREACH OF IMPLIED WARRANTY (Cal.
Civ. Code §§ 1792, 1791.1, *et seq.*) (on behalf of the Nationwide
class or, alternatively, the California Class) ........................................ 40

IX.     REQUEST FOR RELIEF .......................................................................... 42

X.      DEMAND FOR JURY TRIAL .................................................................. 42

CLASS ACTION COMPLAINT

010789-11/1426138 V1

Plaintiffs, based on the investigation of counsel and experts, file this lawsuit individually and on behalf of a class. Plaintiffs allege as follows:

## I.    INTRODUCTION

1.    The most important duty of a car manufacturer is to provide consumers with a safe car. A second related duty is to warn consumers and fix a car where the manufacturer learns of a vehicle defect that implicates serious safety issues.

2.    Hyundai and Kia breached these fundamental duties. Certain Hyundai and Kia vehicles equipped with gasoline direct injection ("GDI") and multipoint fuel injections ("MPI") engines ("Class Vehicles")[1] contain an engine defect that presents consumers with an unacceptable risk of engine failure and spontaneous engine fire while driving.

3.    Hyundai and Kia knew before selling the Class Vehicles that their engines were defective, prone to premature and catastrophic failure, and posed an unreasonable risk of non-collision engine failures and fires. A design and/or manufacturing defect exists in the Class Vehicles that causes the engine's moving parts, such as connecting rod bearings, to prematurely wear to the point that the engine parts seize, which stops engine operation while running (the "Engine Defect"). Engine seizure often causes internal parts, such as the connecting rods, to break and knock a hole in the engine, permitting fluids to leak and ignite a fire.

4.    The Engine Defect exposes putative class members to an unreasonable and increased risk of accident, injury, or death should their vehicle's engine fail while in operation, let alone spontaneously ignite. The Engine Defect also exposes

---

[1] On information and belief, the Class Vehicles include, but are not limited to: 2012 MY Hyundai Santa Fe; 2011-2013, 2016 MY Hyundai Sonata Hybrid; 2015-2016 MY Hyundai Veloster; 2012-2015 MY Kia Forte; 2012-2015 MY Kia Forte Koup; 2011-2013 MY Kia Optima Hybrid; 2012-2013 MY Kia Sorento; 2014-2015 MY Kia Soul; 2012 MY Kia Sportage. Plaintiffs reserve the right to supplement or amend the Class Vehicles after conducting discovery.

- 1 -

passengers and other drivers on the road to an unreasonable and increased risk of accident, injury, or death.

5.     The Engine Defect plagues an ever-increasing number of Hyundai and Kia vehicle models, years, and engines, including the Class Vehicles. Many putative class members, including Plaintiffs Nicole Thornhill, Janet O'Brien, and David Shapiro, have already experienced catastrophic engine failure because of the Engine Defect, costing them thousands of dollars in repairs.

6.     The catastrophic engine failure and fire risk is the direct result of a defect known to, concealed by, and still unremedied by Hyundai and Kia. Not only did Hyundai and Kia actively conceal the Engine Defect from consumers, but they also did not timely reveal that the Engine Defect poses a serious safety hazard.

7.     Hyundai and Kia knew or should have known about the Engine Defect from: (1) putative class member complaints and warranty claims made directly to Hyundai and Kia; (2) technical service bulletins and safety recalls issued by Hyundai and Kia in an attempt to address the Engine Defect; (3) widespread complaints on the internet and lodged with NHTSA; and (4) Hyundai and Kia's own pre-sale durability testing of the Class Vehicles.

8.     Despite Hyundai and Kia's knowledge of the Engine Defect, the automakers have issued piecemeal and belated recalls over the last six years—most recently, the recall of the Class Vehicles—all while omitting similar vehicles without apparent explanation.

9.     Because of Hyundai and Kia's unfair, misleading, deceptive, and/or fraudulent business practices, in failing to disclose the Engine Defect to Plaintiffs and putative class members, owners and lessees of the Class Vehicles have suffered losses in money and property. Had Plaintiffs and the putative class members known of the Engine Defect, they would not have purchased or leased those vehicles, or would have paid substantially less for them. Engine failure and fire in the Class Vehicles also

010789-11/1426138 V1

requires expensive repairs, car rentals, car payments, towing charges, time off work, and other miscellaneous costs. Moreover, because of the Engine Defect and Hyundai and Kia's concealment, the Class Vehicles have a lower market value and are inherently worth less than they otherwise would be.

10.     Plaintiffs bring this action to redress Hyundai and Kia's misconduct. Plaintiffs seek recovery of damages and a repair under state consumer-protection statutes and implied warranties, and reimbursement of all expenses associated with the repair or replacement of the Class Vehicle.

## II.     JURISDICTION AND VENUE

11.     This Court has subject matter jurisdiction under the Class Action Fairness Act of 2005 ("CAFA"), 28 U.S.C. §§ 1332(d)(2) and (6) because: (i) there are one hundred or more class members, (ii) there is an aggregate amount in controversy exceeding $5,000,000.00 exclusive of interest and costs, and (iii) there is minimal diversity because at least one plaintiff and one defendant are citizens of different states. This Court also has supplemental jurisdiction over the state law claims under 28 U.S.C. § 1367.

12.     Venue is proper in this judicial district under 28 U.S.C. § 1391 because Defendants transact substantial business and are headquartered in this district. Defendants advertised in this district and received substantial revenue and profits from sales and/or leases of the Class Vehicles in this district. Defendants also have a manufacturing plant in this district. Therefore, a substantial part of the events and/or omissions giving rise to the claims occurred, in part, within this district.

13.     This Court has personal jurisdiction over Defendants by virtue of their transactions and business conducted in this judicial district, and because Defendants are headquartered in California. Defendants have transacted and done business, and violated statutory and common law, in the State of California and in this judicial district.

010789-11/1426138 V1

### III.   THE PARTIES

**A.    Plaintiffs**

14.     Plaintiff and proposed class representative Nicole Thornhill is a resident and citizen of Ventura, California. In May 2018, Ms. Thornhill purchased a 2012 Kia Optima Hybrid with a 2.4-liter Theta II MPI engine from a private seller in California. Ms. Thornhill purchased the Optima because all her research indicated that it was a safe vehicle, and the vehicle had low mileage and a clean CarFax. Ms. Thornhill had friends with Kias that told her they loved their cars, and her partner worked on Kia and Hyundai advertising campaigns years ago and loved their vehicles, too. She thought she was buying a safe, reliable vehicle. In August 2018, just months after financing the vehicle purchase, Ms. Thornhill was driving to work when she noticed a knocking noise coming from the engine. She dropped the vehicle off at a local mechanic to inspect it that same day. The mechanic said the engine was on the verge of failure and needed immediate repair. Ms. Thornhill took the vehicle to Kirby Kia of Ventura in Ventura, California, where it found the engine had a "lower-end knock from crank area" and required replacement of the short block. Because Ms. Thornhill was still making payments on the vehicle, as well as insuring it, she had to charge the nearly $7,000 engine repair to a credit card. The vehicle sat at the dealership for six months awaiting the short block needed for the repair. This waiting period negatively affected Ms. Thornhill's life and livelihood, as she could not afford a rental vehicle and instead relied on public transportation or borrowing her partner's car for her 60 mile-per-day commute to work. Finally, on February 9, 2019, her vehicle was repaired and returned to her. Roughly one year later, Kia finally recalled her vehicle for the Engine Defect. Ms. Thornhill would not have purchased the vehicle, or she would have paid less for it, had she known about the Engine Defect.

15.     Plaintiff and proposed class representative Janet O'Brien is a resident and citizen of Ferndale, Michigan. In September 2012, Ms. O'Brien purchased a new 2012

CLASS ACTION COMPLAINT

Kia Sportage EX with a 2.4-liter Theta II MPI engine from Al Serra Kia of Grand Blanc in Michigan. The vehicle came with the manufacturer's standard warranty. This warranty was a selling point for Ms. O'Brien, as she interpreted it as indication about the quality of the vehicle and Kia's commitment to stand behind its product. Over the July 4, 2019 holiday weekend, the vehicle suffered catastrophic engine failure while Ms. O'Brien was driving to a local dog park, leaving her stranded on the side of the road with her two dogs in the summer heat. She had just paid the vehicle off a few months before in April. Two Kia dealerships inspected the vehicle and blamed the engine failure on lack of maintenance, even though Ms. O'Brien had it routinely serviced by her local Kia dealership and the dealership had the records to confirm this. After shopping the engine replacement around and receiving a quote for $8,000 from one Kia dealership, Ms. O'Brien sold the vehicle to an online auction house for around $2,000. But for the catastrophic engine failure caused by the Engine Defect, Ms. O'Brien estimates her vehicle was worth around $10,000 based on regular offers to buy it that she received from metro Detroit-based Kia dealerships. During the tumultuous three weeks her vehicle was inoperable, Ms. O'Brien spent about $3,200 in rental car fees and had difficulty finding and buying a new car given the July holiday. She eventually purchased a Subaru that she had to drive to Ohio to pick up. Roughly a year-and-a-half after Ms. O'Brien's catastrophic engine failure, Kia finally recalled her vehicle for the Engine Defect. But the recall only offers relief for vehicle owners' with engines that fail before 150,000 miles, and Ms. O'Brien's engine failure occurred at 153,000 miles. Ms. O'Brien would not have purchased the vehicle, or she would have paid less for it, had she known about the Engine Defect.

16.    Plaintiff and proposed class representative David Shapiro is a resident and citizen of Topanga, California. In May 2018, Mr. Shapiro purchased a used 2016 Hyundai Sonata Hybrid with a 2.0-liter Nu GDI HEV engine from Anaheim Pre-Owned Cars in Pomona, California. Because the vehicle was under 50,000 miles and

CLASS ACTION COMPLAINT

less than five years old at the time of purchase, it was still covered by Hyundai's new car warranty. Mr. Shapiro selected this vehicle because of its hybrid electric engine and favorable test drive of a family member's Hyundai. In November 2020, Mr. Shapiro's daughter was pulling the vehicle out from their home when she heard the engine make concerning noises. Mr. Shapiro had the car towed to Keyes Hyundai Van Nuys. The vehicle's engine had failed and it sat at the dealership for the next two months awaiting arrival of a replacement engine, all while Mr. Shapiro fought with Hyundai to cover the costs of the repair. Initially, Hyundai denied responsibility and warranty coverage for the engine failure altogether. The service representative first told Mr. Shapiro that he had failed to maintain his vehicle properly. After Mr. Shapiro did some research and discovered the engine issue was more widespread, he requested the dealership ask Hyundai to cover the cost. The dealership sent his request to Hyundai and it finally agreed to pay seventy-five percent of the repair costs, but Mr. Shapiro would have to cover the remainder. More than a month later, the dealership told Mr. Shapiro the long block replacement was no longer available and they would have to install a short block instead—a twenty percent cost increase for the repair. This meant Mr. Shapiro's share would go from $1,500 to $2,500 since the total repair was now $9,000. At this point, Mr. Shapiro had been renting a car out-of-pocket for over two months despite requesting one. Again, he demanded a rental vehicle, but was denied. He incurred roughly three months of rental costs while his vehicle was inoperable. Only after the vehicle was finally recalled in December 2020, did Hyundai inform him that it would fully cover the engine replacement. Hyundai also finally agreed to supply a rental car in January 2021. Mr. Shapiro's vehicle was repaired and returned to him in February 2021. Mr. Shapiro would not have purchased the vehicle, or he would have paid less for it, had he known about the Engine Defect.

010789-11/1426138 V1

**B.      Defendants**

17.      Defendant Hyundai Motor Company ("HMC") is a South Korean multinational automaker headquartered in Seoul, South Korea. HMC, together with Defendants Kia Motors Corporation, Kia Motors America, Inc., and Hyundai Motor America, comprise the Hyundai Motor Group, which manufactures the Class Vehicles at issue in this Complaint. HMC is the parent corporation of Hyundai Motor America.

18.      Defendant Hyundai Motor America ("HMA") is an automobile design, manufacturing, distribution, and/or service corporation doing business within the United States. HMA designs, develops, manufactures, distributes, markets, sells, leases, warrants, services, and repairs passenger vehicles, including the Hyundai Class Vehicles.

19.      Defendant HMA is incorporated and headquartered in the state of California with its principal place of business at 10550 Talbert Avenue, Fountain Valley, California 92708. HMA is the American sales, marketing, and distribution arm of its parent company, HMC, overseeing sales and other operations across the United States. HMA distributes and sells a complete line of Hyundai vehicles through more than 800 dealers throughout the United States. Money received from the purchase or lease of a Hyundai vehicle from a dealership flows from the dealer to HMA and HMC (together, "Hyundai"). Hyundai uses its nationwide dealerships as a means to communicate with Plaintiffs and putative class members.

20.      On information and belief, Defendant HMA is responsible for the distribution, service, repair, installation, and decisions regarding the Hyundai Class Vehicles as they relate to the Engine Defect.

21.      On information and belief, Defendant HMA developed the post-purchase owner's manuals, warranty booklets, and other information related to maintenance recommendations and/or schedules for the Hyundai Class Vehicles.

22.     Defendant HMA engages in continuous and substantial business in California.

23.     Defendant Kia Motors Corporation ("KMC") is a South Korean multinational automaker headquartered in Seoul, South Korea. KMC is the parent corporation of Kia Motors America, Inc. As of December 31, 2017, Defendant KMC's largest shareholder is HMC, which holds 33.88 percent of KMC's stock.[2]

24.     Defendant Kia Motors America, Inc. ("KMA") is an automobile design, manufacturing, distribution, and/or service corporation doing business within the United States. KMA designs, develops, manufactures, distributes, markets, sells, leases, warrants, services, and repairs passenger vehicles, including the Kia Class Vehicles.

25.     Defendant KMA is incorporated and headquartered in the state of California with its principal place of business at 111 Peters Canyon Road, Irvine, California 92606. KMA is the American sales, marketing, and distribution arm of its parent company, KMC, overseeing sales and other operations across the United States. KMA distributes and sells a complete line of Kia vehicles through more than 755 dealers throughout the United States. Money received from the purchase or lease of a Kia vehicle from a dealership flows from the dealer to KMA and KMC (together, "Kia"). Kia uses its nationwide dealerships as a means to communicate with Plaintiffs and putative class members.

26.     On information and belief, Defendant KMA is responsible for the distribution, service, repair, installation, and decisions regarding the Kia Class Vehicles as they relate to the Engine Defect.

---

[2] 2017 KMC Annual Report, available at https://pr.kia.com/en/company/ir/ir-library/annual-report.do (last visited Mar. 10, 2021).

- 8 -

CLASS ACTION COMPLAINT

27. On information and belief, Defendant KMA developed the post-purchase owner's manuals, warranty booklets, and other information related to maintenance recommendations and/or schedules for the Kia Class Vehicles.

28. Defendant KMA engages in continuous and substantial business in California.

29. On information and belief, the design, manufacture, modification, installation, and decisions regarding the Class Vehicles and their engines were made exclusively by Defendants.

## IV. FACTUAL ALLEGATIONS

**A. The Engine Defect afflicts numerous engine platforms.**

30. In 2009, Defendants announced their first line of GDI engines in the United States, the "Theta II" engines.[3] The Theta II engines eventually included a turbocharged 2.0-liter model and a naturally aspirated 2.4-liter model.[4] On information and belief, Hyundai used Theta II GDI engines in certain Elantra, Sonata, Santa Fe and Santa Fe Sport, and Tucson vehicles, and Kia used these engines in certain Optima, Sorento, and Sportage vehicles.

31. Defendants also manufacture and use a 2.4-liter Theta II MPI engine. On information and belief, Hyundai used these Theta II MPI engines in certain Sonata Hybrid and Santa Fe vehicles, and Kia used them in certain Optima Hybrid, Sportage, Sorento, Forte, and Forte Koup vehicles.

32. In 2010, Defendants debuted another, smaller GDI engine, the "Gamma" 1.6-liter engine.[5] In or around 2011, Defendants developed a turbocharged version of the 1.6-liter Gamma GDI engine. On information and belief, Hyundai used the

---

[3] https://www.caranddriver.com/news/a18737484/hyundai-unveils-new-2-4-liter-direct-injection-four-cylinder/ (last visited Mar. 10, 2021).

[4] https://www.hyundainews.com/en-us/releases/2291 (last visited Mar. 10, 2021).

[5] *Id.*

Gamma GDI engine in certain Accent, Elantra, Kona, Sonata, Tucson, and Veloster vehicles, and Kia used these engines in certain Forte, Rio, and Soul vehicles.

33.     In or around 2013, Defendants introduced another GDI engine to its lineup, the "Nu" 2.0-liter model.[6] Although first introduced in a 1.8-liter size in 2010, the Nu GDI engine line was expanded in 2012 to include this 2.0-liter version. On information and belief, Kia used the Nu 2.0-liter GDI engines in certain Forte, Optima, and Soul vehicles, while Hyundai used these engines in certain Tucson, Elantra, and Sonata Hybrid vehicles.

34.     On information and belief, the Class Vehicles are equipped with various MPI and GDI engines that contain the Engine Defect. The Engine Defect causes the vital engine parts, including but not limited to the connecting rod and connecting rod bearings, to wear and fail prematurely. The worn engine parts can result in abnormal knocking noise from the engine and illumination of the oil pressure warning light. Worse, it can seize and break while driving, immediately ceasing engine operation and often knocking a hole in the engine block. Leaking engine fluids can ignite, causing a sudden engine fire. Along with creating a severe driving hazard and increasing the chance of injury or death, the Engine Defect causes serious, extensive, and expensive damage to the engine and even total loss of the Class Vehicle.

35.     Despite the Engine Defect, Defendants marketed their vehicles to Plaintiffs and putative class members as safe, reliable, and functional, and touted their engines. Below are examples pulled from Defendants' vehicle brochures:

---

[6] https://www.hyundainews.com/en-us/releases/1726 (last visited Mar. 10, 2021).

CLASS ACTION COMPLAINT

1
2
3
4
5
6
7
8
9
10
11
12



13
14
15
16
17
18

**EXCERPT FROM 2014 KIA SOUL BROCHURE**

19
20
21
22
23
24
25
26
27
28

CLASS ACTION COMPLAINT

010789-11/1426138 V1

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28



2016 HYUNDAI SONATA HYBRID

# THE NEW SONATA HYBRID. COMMON SENSE IS NOW MORE SENSUOUS THAN EVER.

Tell Hyundai engineers to find room for improvement, and you know what you'll get? In the all-new, totally redesigned 2016 Sonata Hybrid, you get more room – more passenger room, and more cargo room. In fact, by redesigning the hybrid battery system packaging and moving it under the trunk floor, we've given the new Sonata Hybrid more total interior volume than any hybrid in its class.[1]

You also get more fuel efficiency. Powered by a new 2.0L GDI hybrid engine, the 2016 Sonata Hybrid delivers an EPA-estimated 44 MPG on the highway,[2] And the improvements don't stop there. Its regenerative braking system captures more electric charge than the previous model, and its steering and suspension systems are more dynamic. Its safety systems are more advanced, too, with available technologies like Blind Spot Detection, Forward Collision Warning, and more.

Now here's where common sense gets sensuous. Sonata Hybrid's sleek new exterior is a more sophisticated design – an expression of our Fluidic Sculpture accented by LED Daytime Running Lights, unique LED taillights and Eco-spoke alloy wheels. The aerodynamic benefits of a full underbody cover and active air flaps behind the front grille contribute to an industry-leading 0.24 drag coefficient that helps the car slip through the air (boosting Sonata Hybrid's fuel efficiency even further).

Inside, the cabin is more luxurious, with standard dual automatic temperature control and available features like a heated steering wheel, ventilated front seats and heated front/rear seats. We even found room for improvement in America's Best Warranty. The hybrid-related components of Sonata Hybrid are covered for 10 years or 100,000 miles with a lifetime hybrid battery warranty. No other car in its class can match that.

[1] Claim based on comparison of specifications on manufacturer websites. [2] EPA estimates for comparison only. Mileage may vary. Your actual mileage will vary with options, driving conditions, driving habits and vehicle's condition.

> You also get more fuel efficiency. Powered by a new 2.0L GDI hybrid engine, the 2016 Sonata Hybrid delivers an EPA-estimated 44 MPG on the highway.

**EXCERPT FROM 2016 HYUNDAI SONATA HYBRID BROCHURE**

- 12 -
CLASS ACTION COMPLAINT

Step on the gas, and feel how eagerly it accelerates off the line. That's Gasoline Direct Injection giving its 1.6-liter engine a stunning combination of 138 horsepower and outstanding fuel economy.

EXCERPT FROM 2015 HYUNDAI VELOSTER BROCHURE

**B.    The Engine Defect results in a serious risk of spontaneous fires across multiple models and years.**

36.     Complaints submitted to Defendants and to NHTSA via Vehicle Owner Questionnaires ("VOQ") reveal a large number of Defendants' vehicles catching on fire. In 2019, NHTSA opened an investigation into non-collision engine fires in Defendants' vehicles in response to a petition from the Center for Auto Safety after identifying more than 3,000 reports of non-collision fires in Hyundai and Kia vehicles,

- 13 -

CLASS ACTION COMPLAINT

including Class Vehicles.[7] In the course of this investigation, NHTSA expanded its scope to include additional vehicles, including the Class Vehicles, as fire reports grew.

37.     Before NHTSA began its investigation, the Center for Auto Safety reviewed non-collision fire data and found, in NHTSA's VOQ database alone, at least 120 reports of 2011-2014 Optima, Sorento, Sonata, or Santa Fe vehicles catching fire without a preceding collision.[8] There were also 229 separate complaints regarding melted wires in the engine bay, smoke, and burning odors, indicating potential fires.[9] The vast majority of complaints that discuss the origins of the vehicle fires state that smoke and/or flames are first seen emanating from the engine bay before engulfing the car in flames.

38.     Based on the high volume of non-collision vehicle fires, on June 11, 2018, the Center for Auto Safety petitioned NHTSA to investigate a fire-causing defect in 2011-2014 Kia Optima and Sorento, and Hyundai Sonata and Santa Fe vehicles.[10] On July 24, 2018, the Center filed an addendum to its original petition, requesting NHTSA expand the investigation to include 2010-2015 Kia Soul vehicles.[11]

---

[7] See NHTSA PE19-003 (Hyundai), available at https://static.nhtsa.gov-/odi/inv/2019/INOA-PE19003-2613.PDF (last visited Mar. 10, 2021); NHTSA PE19-004 (Kia), available at https://static.nhtsa.gov/odi/inv/2019/INOA-PE19004-4727.PDF (last visited Mar. 10, 2021).

[8] See 2011-14 Hyundai Kia Fire Complaints excel spreadsheet containing NHTSA complaint data, available at http://www.autosafety.org/wp-content/uploads/2018/06/2011-14-Hyundai-Kia-Fire-Complaints-FINAL.xlsx (last visited Mar. 10, 2021).

[9] Id.

[10] See June 11, 2018 Center for Auto Safety Petition, available at https://www.autosafety.org/wp-content/uploads/2018/06/Center-for-Auto-Safety-Kia-Hyundai-Fire-Defect-Petition.pdf (last visited Mar. 10, 2021).

[11] See July 24, 2018 Center for Auto Safety Petition, available at https://www.autosafety.org/wp-content/uploads/2018/06/Center-for-Auto-Safety-Addendum-to-June-11-2018-petition-regarding-Kia-Hyundai-fires.pdf (last visited Mar. 10, 2021).

CLASS ACTION COMPLAINT

39.     In October 2018, as reports of these fires continued to increase, the Center for Auto Safety publically called on Defendants to recall these vehicles, saying, "Since our call for an investigation into these Kia and Hyundai non-collision fires, we have seen reports of ***almost one fire every single day across these five models***."[12] The statement went on to say, "The number and severity of these complaints, when people are simply driving their cars on the highway, is frightening. It is long past time for Kia and Hyundai to act. Car fires put everyone on the road in significant danger."

40.     The Center for Auto Safety reported that between June 12 and October 12, 2018, it learned of 103 additional fire reports, amounting to an 85% increase.

41.     While automakers occasionally produce vehicles that catch fire, when compared to these Hyundai and Kia vehicles, the Center for Auto Safety noted that there is enough of a statistical disparity to suggest a systemic issue. More specifically, in its June 7, 2018 review of all NHTSA-reported cases of non-collision fires involving similar class and size vehicles, the Center found there were 22 reported cases in competitor vehicles as opposed to 120 for the Kia and Hyundai models.[13] The June 11, 2018 Petition noted that Defendants' competitors Honda and Toyota sold 3.4 million comparable vehicles in the U.S. to Defendants' approximately 2.2 million vehicles, and that "[w]hen factoring in the number of vehicles of these types sold per manufacturer compared to the number of fire complaints, the differences are even more profound."[14]

---

[12] October 12, 2018 Center for Auto Safety Press Release, available at https://www.autosafety.org/center-for-auto-safety-demands-recall-of-2-9-million-2011-2014-kia-and-hyundai-vehicles-after-almost-one-non-collision-fire-report-every-day-for-four-months/ (last visited Mar. 10, 2021).

[13] *See* June 11, 2018 Center for Auto Safety Petition, available at https://www.autosafety.org/wp-content/uploads/2018/06/Center-for-Auto-Safety-Kia-Hyundai-Fire-Defect-Petition.pdf (last visited Mar. 10, 2021).

[14] *Id.*

CLASS ACTION COMPLAINT

42.    Summarizing its findings on these five Hyundai/Kia vehicle models, the Center for Auto Safety found that as of July 23, 2018, NHTSA's VOQ database contained reports of at least:

- 39 non-collision 2011-2014 Kia Sorento fires
- 36 non-collision 2011-2014 Kia Optima fires
- 23 non-collision 2010-2015 Kia Soul Fires
- 51 non-collision 2011-2014 Hyundai Sonata fires
- 12 non-collision 2011-2014 Hyundai Santa Fe fires
- **161 non-collision fires total**

43.    Some typical examples of NHTSA non-collision fire complaints include:

**2013 Hyundai Sonata – NHTSA ID No. 11115600**

I WAS DRIVING MY VEHICLE ON THE 95 N GOING ONTO 295 N HIGHWAY FOR APPROXIMATELY 1 HOUR WHEN IT STARTED TO LOSE POWER AND SMOKE. I PULLED OVER AND DISCOVERED VIA ANOTHER CAR PASSING BY THAT THE VEHICLE WAS ON FIRE AND IT WENT UP IN FLAMES.

**2013 Kia Optima – NHTSA ID No. 11112989**

TL* THE CONTACT OWNED A 2013 KIA OPTIMA. WHILE DRIVING 60 MPH, SMOKE APPEARED UNDER THE VEHICLE ON THE DRIVER¿S SIDE. THE CONTACT WAS ALERTED OF FLAMES BY OTHER MOTORISTS. THE CONTACT PULLED THE VEHICLE OVER TO THE SIDE OF THE ROAD AND EXITED ON THE PASSENGER SIDE. THERE WERE NO INJURIES SUSTAINED. THE FIRE DEPARTMENT EXTINGUISHED THE FIRE AND A POLICE REPORT WAS FILED. THE VEHICLE WAS TOWED AND DEEMED A TOTAL LOSS. THE CONTACT CALLED EARNHARDT KIA DEALER AT (602) 346-5400 (LOCATED AT 2121 E BELL RD, PHOENIX, AZ 85022), BUT THE VEHICLE WAS NOT DIAGNOSED OR REPAIRED. THE MANUFACTURER WAS MADE AWARE OF THE FAILURE. THE VIN WAS NOT AVAILABLE. THE FAILURE MILEAGE WAS 30,000.

- 16 -

**2012 Kia Sorento – NHTSA ID No. 11111708**

JUNE 23 DRIVING ON THE FREEWAY POPPING NOISECOMING FROM WHAT SOUNDED LIKE UNDER THE CAR RED ENGINE SYMBOL COMES ON IN THE LOWER LEFT HAND CORNER OF DASH IMMEDIATELY BEGIN GETTING OVER SECOND POPPING OCCURS WITHIN 10-15 SECONDS RED OIL LAMP LIGHT COMES ON RIGHT HAND SIDE OF DASHBOARD SMOKING FROM VEHICLE HAPPENS IMMEDIATELY GET TO SIDE OF FREEWAY ATTEMPT TO TURN OFF CAR RESTARTS ATTEMPT AGAIN TURNS OFF IMMEDIATELY GET OUT OF CAR AND RUN TOWARDS GOOD SAMARITAN WHO WITNESSES ENTIRE THING STOPS AND STAYS WITH ME ENTIRE TIME 911 CALLED ANOTHER VEHICLE PULLS OVER AS FRONT OF VEHICLE IS FULLY ENGULFED IN FLAMES AND ATTEMPTS TO EXTINGUISH FIRE BUT TO NO AVAIL FIRE TRUCKS AND FREEWAY ROADSIDE ASSISTANCE COME WITHIN 10 MINUTES OF INCIDENT EXTINGUISH FRONT OF MY VEHICLE TOWED IN MOTION AT BEGINNING ON FREEWAY PULLED OVER AND GOT OUT ON SIDE OF FREEWAY NHTSA RECALL NUMBER17V224 MAY AND OCTOBER 2017 JUST HAD 105,000 MILE MAINTENANCE DONE AT RALLY KIA ON JUNE 11

**2014 Kia Soul – NHTSA ID No. 11120580**

ON AUGUST 16, 2018 AT APPROX 1030 PM MY DAUGHTER WAS DRIVING ON ROUTE 5 IN HOLLIS CETNER MAINE AT APPROX 50 MPH AND CAR STARTED RUNNING ROUGH, SMOKE STARTED COMING FROM UNDER HOOD. PULLED OVER TO THE SIDE OF ROAD AND CAR WAS ON FIRE UNDERNEATH ENGINE, MELTING THE ENGINE. FOUND MELTED ENGINE PARTS (PISTON HEADS, CONNECTING RODS) ON THE GROUND ALONG WITH OTHER MELTED PARTS. FIRE WAS PUT OUT BY HOME OWNER ON ROUTE 5.

44.     On August 21, 2018, in response to the Center for Auto Safety's petition for investigation, NHTSA's Office of Defects Investigations ("ODI") opened a Defect Petition (DP18-003) to evaluate whether to grant or deny the petition. In September

- 17 -
CLASS ACTION COMPLAINT

and October 2018, ODI sent Information Request letters to Defendants requesting information on all engine and non-engine related fires in the vehicles identified in the Center for Auto Safety's petition.

45.    ODI's initial inquiries to Defendants uncovered more than 3,000 complaints of non-collision vehicle fires, and more than 100 injuries from these non-collision vehicle fires, in Class Vehicles.[15]

46.    On March 29, 2019, based on its extensive analysis of the information obtained from Defendants and its review of other applicable materials, ODI granted the Center for Auto Safety's petition and opened a preliminary evaluation to assess the scope, frequency, and potential safety-related consequences of alleged defects relating to non-collision vehicle fires in Hyundai's 2011-2014 Sonata and Santa Fe, Kia's 2011-2014 Optima and Sorento, and Kia's 2010-2015 Soul.

47.    Notably, in its April 12, 2019 letters to Hyundai and Kia, ODI expanded the scope of its investigation into Defendants' vehicles to include "all other [Hyundai and Kia] vehicles equipped with Theta II, Lambda II, Gamma and Nu engines, manufactured for sale or lease in the United States, including, but not limited to, the District of Columbia, and current U.S. territories and possessions."[16] To date, this NHTSA investigation is ongoing.

48.    On information and belief, Defendants were aware of the alarming failure rate of the Class Vehicles' engines caused by the Engine Defect through but not limited to: (1) Defendants' own records of customer complaints and warranty claims;

---

[15] *See* NHTSA PE19-003 (Hyundai), available at https://static.nhtsa.gov-/odi/inv/2019/INOA-PE19003-2613.PDF (last visited Mar. 10, 2021); NHTSA PE19-004 (Kia), available at https://static.nhtsa.gov/odi/inv/2019/INOA-PE19004-4727.PDF (last visited Mar. 10, 2021).

[16] *See* Apr. 12, 2019 NHTSA Ltr. to Hyundai, available at https://static.nhtsa.gov/odi/inv/2019/INIM-PE19003-74878.pdf (last visited Mar. 10, 2021); *See* Apr. 12, 2019 NHTSA Ltr. to Kia, available at https://static.nhtsa.gov/odi/inv/2019/INIM-PE19004-74879.pdf (last visited Mar. 10, 2021).

CLASS ACTION COMPLAINT

(2) dealership repair records; (3) NHTSA complaints; and (4) Defendants' pre-sale durability testing.

**C.      Defendants issue piecemeal, inadequate, and incomplete recalls.**

49.      From 2015 to present, Defendants reluctantly and belatedly recalled hundreds of thousands of vehicles—including most recently the Class Vehicles—spanning many models and years, and equipped with a myriad of GDI and MPI engines, for the same Engine Defect.

50.      In June 2015, NHTSA contacted Hyundai regarding instances of stalling events in 2011-2012 Hyundai Sonatas. "Hyundai explained that, as of that time, it did not consider the issue to be safety-related…."[17] NHTSA responded by, as Hyundai put it, "inform[ing] Hyundai of its concern over the potential for higher speed stalling events."

51.      Because of NHTSA's prodding, in September 2015, Hyundai issued Recall No. 15V568000 for 470,000 MY 2011-2012 Hyundai Sonata vehicles equipped with 2.4L and 2.0L turbo GDI engines for a defect described as "connecting rod wear" that "may result in engine stall."

52.      In its NHTSA filings, Hyundai described the Recall No. 15V568000 defect and manifestation as follows:

> Hyundai has determined that metal debris may have been generated from factory machining operations as part of the manufacturing of the engine crankshaft during the subject production period. As part of the machining processes, the engine crankshaft is cleaned to remove metallic debris. If the debris is not completely removed from the crankshaft's oil passages, it can be forced into the connecting rod oiling passages restricting oil flow to the bearings. Since bearings are cooled by oil flow between the bearing and journal, a reduction in the flow of oil may raise bearing temperatures

---

[17] Part 573 Safety Recall Report Chronology for NHTSA Recall No. 15V568000, Sept. 10, 2015, available at https://static.nhtsa.gov/odi/rcl/2015/RCLRPT-15V568-9490.PDF (last visited Mar. 10, 2021), at 2.

increasing the potential of premature bearing wear. A worn connecting rod bearing will produce a metallic, cyclic knocking noise from the engine which increases in frequency as the engine rpm increases. A worn connecting rod bearing may also result in illumination of the oil pressure lamp in the instrument cluster. If the vehicle continues to be driven with a worn connecting rod bearing, the bearing can fail, and the vehicle could stall while in motion.[18]

53.    Subsequently, in December 2015, Hyundai issued a Technical Service Bulletin (TSB) to dealerships about Recall No. 15V568000 and the steps for performing recall procedures. The TSB instructed dealerships to conduct "an Engine Noise Inspection to confirm [the engine's] normal operation" and that the sound test would "help indicate if the engine is operating normally or if an excessive connecting rod bearing wear condition in the engine crankcase may be present." The TSB went on to describe the consequences if the defect manifested, stating, "If the vehicle continues to be driven with a worn connecting rod bearing, the bearing can fail, and the vehicle could stall while in motion, increasing the risk of a crash."[19]

54.    Tellingly, Hyundai breezed over the inherent risk of vehicle fires associated with the defect in both its descriptions to vehicle owners/lessees and dealers, settling on the more benign outcome, a stall, over the deadly ones, catastrophic engine failure and/or fire.[20]

---

[18] *Id.* at 1.

[19] Dec. 2015 Remedy Instructions and TSB, available at https://static.nhtsa.gov/odi/rcl/2015/RCRIT-15V568-3933.pdf (last visited Mar. 10, 2021), at 1.

[20] *See, e.g.*, "Recall 17V226000[:] Engine Wears and Seizes," RepairPal.com, Mar. 31, 2017, available at https://repairpal.com/recall/17V226000 (last visited Mar. 10, 2021) (noting that, despite the defect consequences being limited to "engine seizing [that] would possibly strand occupants or cause an accident," the reality is that the bearings inside the engine "could wear prematurely due to machining issues during manufacturing[, and i]f the engine seizes as a result, a fire could occur, and the engine would lose vehicle propulsion").

55.     Hyundai's December 2015 TSB in Recall No. 15V568000 only called for engine replacement if the vehicle did not pass the sound test. If the engine did pass, no actual repair was made to the vehicle, its engine, or any other parts. Hyundai simply instructed the dealers to swap out the vehicle's dipstick and top off the oil. This left "passing" vehicles and their owners vulnerable to future development and manifestation of the Engine Defect and its dire consequences.

56.     In March 2017, Hyundai issued Recall No. 17V226000 for 572,000 MY 2013-2014 Hyundai Sonata and Santa Fe Sport vehicles equipped with 2.0L and 2.4L GDI engines for a defect described as "bearing wear" that "may result in engine seizure."

57.     In its NHTSA filings, Hyundai described the Recall No. 17V226000 defect and manifestation as follows:

> The subject engines may contain residual debris from factory machining operations, potentially restricting oil flow to the main bearings and leading to premature bearing wear. A worn connecting rod bearing will produce a cyclic knocking noise from the engine and may also result in the illumination of the oil pressure lamp in the instrument panel. Over time, the bearing may fail and the vehicle could lose motive power while in motion.[21]

58.     In June 2017, Hyundai issued a TSB and Dealer Best Practice Guide to dealers addressing the issue in the 2013-2014 Sonata and Santa Fe vehicles. The documents describe a defect identical to that in the earlier Sonata model years and orders the same purported "fix":

> The engines in certain 2013-2014 model year Sonata (YF) and Santa Fe Sport (AN) vehicles equipped with 2.4L and 2.0T GDI engines may contain residual debris from factory machining operations, potentially restricting oil flow to the

---

[21] Part 573 Safety Recall Report for NHTSA Recall No. 17V226000, Mar. 31, 2017, available at https://static.nhtsa.gov/odi/rcl/2017/RCLRPT-17V226-4558.pdf (last visited Mar. 10, 2021), at 1.

CLASS ACTION COMPLAINT

main bearings and leading to premature bearing wear. Over time, a bearing may fail and the vehicle could lose power while in motion.

Indications of a worn connecting rod bearing include:
1. Knocking noise from the engine
2. Reduced power and/or hesitation
3. Illumination of the "Check Engine" warning lamp
4. Illumination of engine oil pressure warning lamp

The service process consists of an inspection and dipstick, oil and oil filter replacement. If the vehicle does not pass the inspection, the dealer will replace the engine.[22]

59.     Much like Hyundai's earlier 2011-2012 Sonata recall, in its Part 573 Safety Recall Report for NHTSA Recall No. 17V226000, Hyundai summarily explains that, "Over time, the bearing may fail and the vehicle could lose motive power while in motion."[23] Careful not to even use the word "stall," Hyundai's 2017 "recall inspection" of later model year Sonatas for a malfunction mechanically known to be associated with vehicle fires demonstrates Hyundai's continued concealment of the Engine Defect and its consequences to this day.

60.     Notably, in its chronology submission for the recall associated with subsequent model year Sonatas (NHTSA Recall No. 17V226000), Hyundai conceded that its recall was the result of Hyundai "continu[ing] to monitor engine-related field data" from the original 15V568000 recall group and "noting an increase in claims relating to the subsequent model years."[24]

61.     Again attempting to mitigate the gravity of the Engine Defect, Hyundai noted in its chronology submission to NHTSA that "the majority of claims for engine

---

[22] June 2017 Dealer Best Practice Guide, available at https://static.nhtsa.gov/odi/rcl/2017/RCMN-17V226-4739.pdf (last visited Mar. 10, 2021), at 3.

[23] Part 573 Safety Recall Report for NHTSA Recall No. 17V226000, Mar. 31, 2017, available at https://static.nhtsa.gov/odi/rcl/2017/RCLRPT-17V226-4558.pdf (last visited Mar. 10, 2021), at 2.

[24] *See id.*

CLASS ACTION COMPLAINT

replacement indicated that customers were responding to substantial noise or the vehicle's check engine or oil pressure warning lights (and bringing their vehicles to service as a result of those warnings)."[25] In other words, Hyundai was relying on customers to prevent their own catastrophic engine failure that could *at best* result in a moving stall and *at worst* result in a vehicle fire.

62.     In March 2017, Kia also issued a recall virtually identical to that of Hyundai: Recall No. 17V224000 for 618,160 MY 2011-2014 Optima, 2012-2014 Sorento, and 2011-2013 Sportage vehicles equipped with 2.0L turbo GDI or 2.4L GDI engines for a defect described as "bearing wear" that "may result in engine seizure."

63.     In its NHTSA filings, Kia described the Recall No. 17V224000 defect and manifestation as follows:

> Metal debris may have been generated from factory machining operations as part of the manufacturing of the engine crankshaft which may not have been completely removed from the crankshaft's oil passages during the cleaning process. In addition, the machining processes of the crankpins caused an uneven surface roughness. As a result, the metal debris and uneven surface roughness can restrict oil flow to the bearings, thereby increasing bearing temperatures causing premature bearing wear. A worn connecting rod bearing will produce a cyclic knocking noise from the engine and may also result in the illumination of the engine warning lamp and/or oil pressure lamp in the instrument panel. If the warnings are ignored and the vehicle is continued to be driven, the bearing may fail and the vehicle could stall while in motion.[26]

64.     But in Kia's September 2017 TSB to dealers for Recall No. 17V224000, in addition to the metal debris problem, it lists an extra cause for the oil restriction:

---

[25] *Id.*

[26] Part 573 Safety Recall Report for NHTSA Recall No. 17V224000, Mar. 31, 2017, available at https://static.nhtsa.gov/odi/rcl/2017/RCLRPT-17V226-4558.pdf (last visited Mar. 10, 2021), at 2.

CLASS ACTION COMPLAINT

"the additional machining processes of the crankpins may have caused uneven surface roughness."[27] The TSB states, "These combined conditions can restrict oil flow to the bearings increasing the potential for premature bearing wear."[28]

65.     Kia's recall procedure mirrored that of Hyundai's in its two recalls: perform the sounds test, and if the engine passes, simply change out the color-coded dipstick and change the oil. If the car does not pass, replace the engine.[29]

66.     Curiously, in its chronology submitted to NHTSA regarding Recall No. 17V224000, Kia notes that when it learned of the Hyundai 15V568000 recall in September 2015, it "check[ed] Theta engine manufacturing process for Optima on separate assembly line and identifie[d] different procedures and no issues."[30] But the chronology goes on to say that from January to April 2016, the engine remanufacturer Translead conducted a "detailed review of all recent Kia warranty returned engines" and identified "*oil delivery issue* with Theta GDI engines (Optima, Sportage & Sorento)."[31] (Emphasis added.) As Kia's warranty claims increased through 2016, it extended the warranties on these vehicles, but still waited until March 2017 to issue a formal recall after finally focusing "on anticipatory risk compared to absence of accidents or injuries."[32]

---

[27] Revised Remedy Instructions and TSB for NHTSA Recall No. 17V224000, Sept. 1, 2017, available at https://static.nhtsa.gov/odi/rcl/2017/RCRIT-17V224-4127.pdf (last visited Mar. 10, 2021), at 1.

[28] *Id.*

[29] *See id.*

[30] Chronology addendum to Second Amended Part 573 Safety Recall Report for NHTSA Recall No. 17V226000, Aug. 23, 2017, available at https://static.nhtsa.gov/odi/rcl/2017/RMISC-17V224-3802.pdf (last visited Mar. 10, 2021), at 1.

[31] *Id.*

[32] *Id.* at 2.

CLASS ACTION COMPLAINT

67.     Throughout all three recalls, Defendants boasted no reports of accidents or injuries associated with the Engine Defect.[33] Even if taken as true, this means Hyundai and Kia would have hundreds of thousands of defective vehicle drivers *wait to be injured or die* as a result of a defect that admittedly results in moving stalls and spontaneous vehicle fires.

68.     However, based on NHTSA's March 29, 2019 decision to open preliminary evaluations into Defendants' high incidence of non-collision fires in certain Class Vehicles, we now know that Defendants' claims of no injuries are false. By that time, Defendants had received **at least 100** reports of injuries related to these non-collision vehicle fires.[34] And this number is likely to continue to grow, as NHTSA expands its investigation to include all Hyundai and Kia vehicles equipped with Theta II, Lambda II, Gamma and Nu GDI engines, including all Class Vehicles.

69.     In addition to NHTSA's investigation into non-collision fires in Defendants' vehicles, the federal agency also previously opened Recall Queries (RQ17003 and RQ17004) into Hyundai's recall of 2011-2014 Sonata and 2013-2014 Santa Fe vehicles with "Theta II" engines (Recall Nos. 15V-568 and 17V-226), and Kia's recall of 2011-2014 Optima, 2012-2014 Sorento, and 2011-2013 Sportage vehicles with "Theta II" engines (Recall No. 17V-224). The Recall Queries, opened on May 18, 2017, scrutinize both the timeliness and scope of Defendants' "Theta II" engine recalls and Defendants' compliance with reporting requirements. These NHTSA investigations are ongoing.

---

[33] *See id.*; Part 573 Safety Recall Report for NHTSA Recall No. 17V226000, Mar. 31, 2017, available at https://static.nhtsa.gov/odi/rcl/2017/RCLRPT-17V226-4558.pdf (last visited Mar. 10, 2021).

[34] *See* NHTSA PE19-003 (Hyundai), available at https://static.nhtsa.gov-/odi/inv/2019/INOA-PE19003-2613.PDF (last visited Mar. 10, 2021); NHTSA PE19-004 (Kia), available at https://static.nhtsa.gov/odi/inv/2019/INOA-PE19004-4727.PDF (last visited Mar. 10, 2021).

70.     In or around October 2018, Kia began sending owners and lessees of 2011-2014 Optima, 2012-2014 Sorento, and 2011-2013 Sportage vehicles letters regarding a "Product Improvement Campaign" in response to widespread reports of non-collision vehicle fires that stated:

> Kia Motors America, Inc. is conducting an important Product Improvement Campaign to perform a software update on all 2011-2013 MY Optima vehicles equipped with 2.4L Gasoline Direct Injection ("GDI") and 2.0L Turbocharged GDI ("T-GDI") engines, and some 2014 MY Optima vehicles equipped with 2.4L GDI and 2.0L T-GDI engines to protect the engine from excessive connecting rod bearing damage. The update will be done free of charge and will only involve the addition of newly developed computer software for the Engine Control Unit ("ECU").

> Kia recently developed a Knock Sensor Detection System ("KSDS") that detects vibrations indicating the onset of excessive connecting rod bearing wear in the engine. The KSDS is designed to alert a vehicle driver at an early stage of bearing wear before the occurrence of severe engine damage including engine failure.

71.     In or around late January 2019, Kia expanded this "Product Improvement Campaign" to include later model years of Optima, Sorento, and Sportage vehicles.

72.     In or around February 15, 2019, Hyundai followed suit by issuing a "Product Improvement Campaign" for certain 2011-2018 Sonatas, 2013-2018 Santa Fe Sports, and 2014-2015, 2018 Tucsons. The campaign provides the same or similar Knock Sensor Detection System as in the Kia vehicles.

73.     In December 2020, Hyundai and Kia finally recalled the Class Vehicles under Recall Nos. 20V746000 (Hyundai) and 20V750000 (Kia) for the same Engine Defect plaguing other vehicles that were the subject of NHTSA's investigations and recalled earlier.

74.    Hyundai's Recall No. 20V746000 includes 128,948 vehicles across four models that are equipped with 2.4-liter Theta II MPI, 2.0-liter Nu GDI, and 1.6-liter Gamma GDI engines manufactured between June 2010 and July 2016 at plants in Alabama and the Republic of Korea. Hyundai's associated NHTSA filings indicate all vehicles from this recall "were determined jointly by Hyundai and NHTSA's Office of Defects Investigation ("ODI") during a review of Hyundai's response(s) to investigations PE19-003."

75.    Kia's Recall No. 20V750000 includes 294,756 vehicles across six models that are equipped with 2.4-liter Theta II MPI and 2.0-liter Nu GDI engines manufactured between February 2011 and May 2015 at unspecified plants or the Kia Hwasung Plant. Kia's associated NHTSA filings indicate all vehicles from this recall were determined through a review of vehicle production records.

76.    While the MPI engines in the Class Vehicles are recalled for the Engine Defect for the first time here, the Nu and Gamma GDI engines were previously recalled in connection with a defect that sounds suspiciously similar to the Engine Defect.

77.    On February 22, 2019, Kia recalled 2012-2016 Souls with 1.6-liter Gamma GDI engines for what it described as an overheating catalytic converter. A closer review of the defect summary reveals that the defect causes the same damage and risk as that of the Engine Defect here, stating, "[the] damage may result in an engine stall," "[a] broken connecting rod may puncture the engine block allowing engine oil to escape," and such "leaking oil may contact the exhaust, increasing the risk of a fire."

78.    Defendants have also attempted to alleviate public and governmental scrutiny of its vehicles' increased incidence of engine failures and fires by initiating other recalls in the various models plagued by engines fires, but these recalls fail to

CLASS ACTION COMPLAINT

adequately explain and remedy the Engine Defect broadly observed across so many of Defendants' vehicles.

79.     In December 2018, Defendants recalled certain 2011-2014 Hyundai Sonata, 2013-2014 Hyundai Santa Fe Sport, 2011-2017 Kia Optima, 2012-2017 Kia Sorento, and 2011-2018 Kia Sportage vehicles previously repaired under Recall Nos. 15V-568, 17V-226, and 17V-224, citing the problem as a damaged high pressure fuel pipe connecting to the fuel pump outlet during an engine replacement procedure.

80.     In February 2019, Hyundai recalled certain 2011-2013 Tucson vehicles and Kia recalled certain 2011-2012 Sportage vehicles, claiming the engine oil pan could leak and, if not addressed, lead to engine damage and a moving stall. This recall implicates only a fraction of the Class Vehicles and does not otherwise explain the widespread engine failures and fires.

81.     Given Defendants' slow issue of recalls over time for the same Engine Defect, the recent inclusion of certain MPI engines in such recalls for the first time, and persistent reports of non-collision engine failures and fires across many models with various engines, Plaintiffs have reason to believe the Engine Defect extends beyond the Class Vehicles plead here or in other related cases. Plaintiffs reserve their right to amend the Class Vehicles as discovery warrants.

**D.      Defendants' pre-sale durability testing**

82.     Defendants are experienced in the design and manufacture of consumer vehicles. As experienced manufacturers, Defendants conduct tests like pre-sale durability testing on incoming components, including the engine, to verify the parts are free from defects and align with Defendants' specifications.

83.     Kia conducts expansive presale durability testing on its vehicles to make sure they "endure over a long time without fault."[35] This presale testing includes seven

---

[35] https://www.kia.com/id/experience/innovation-story/performance.Theta.html (last visited Mar. 10, 2021).

different types of durability tests: (1) an item durability test; (2) a module durability test; (3) a Belgian road test; (4) a high-speed test; (5) a corrosion test; (6) a P/T test; and (7) a vehicle test. Kia conducts these tests in extreme weather conditions including coldness and heat.

84.     In addition, John Juriga, the Director of Powertrain at Kia in 2015, stated that Kia's validation testing is among the toughest in the automotive industry.[36] Among other things, this validation testing runs the engine at maximum throttle (the maximum speed the engine can operate under) while under full load "so we're stressing the components as much as possible and we run it virtually nonstop for 300 hours." After, Kia does an "overrun spec" where it runs it over spec for 10-20 hours to make sure it can survive past the red line limits in order to "make sure these products stay durable in the customers' hands."

85.     Moreover, Kia also uses "the most extreme and rigorous vehicle testing program ever devised by the company."[37] As part of this test, Kia stimulates stop-and-go driving repeated over several times to "put additional strain on the engine, transmission and HVAC systems and eliminate any possible flaws." In addition, at its Mojave Proving Grounds test site, Kia utilizes a "high-speed oval, gravel off-road tracks, high-vibration road surfaces, brake test facilities and different gradients" that "enable engineers to evaluate and refine the ride, handling, brakes and NVH of prototype and production vehicles."

86.     On information and belief, Hyundai conducts durability testing on its vehicles that is similar to Kia's testing.[38]

---

[36] https://www.youtube.com/watch?v=GNPB3RtHN2M (last visited Mar. 10, 2021).

[37] https://www.thenewsmarket.com/global/kia-motors-corporation/death-valley-hot-weather-test-for-all-new-kia-sportage/s/bfe8a9b5-9786-4e73-a648-2970972d74f1 (last visited Mar. 10, 2021).

[38] See, e.g., https://www.hyundai.news/eu/model-news/hail-rain-or-shine-hyundai-motors-extreme-weather-testing/ (last visited Mar. 10, 2021).

- 29 -

# V.    CLASS ALLEGATIONS

87.    Plaintiffs bring this action on behalf of themselves and as a class action under the provisions of Rules 23(a), b(2), and (b)(3) of the Federal Rules of Civil Procedure, on behalf of the following classes:

**Nationwide Class**

All persons or entities who purchased or leased a Class Vehicle in the United States.

**California State Class**

All persons or entities who purchased or leased a Class Vehicle in the State of California.

88.    Excluded from the Classes are individuals who have personal injury claims resulting from the Engine Defect in the Class Vehicles. Also excluded from the Classes are Defendants and their subsidiaries and affiliates; all persons who timely elect exclusion from the Classes; governmental entities; and the Judge to whom this case is assigned and his/her immediate family. Plaintiffs reserve the right to revise the Class definitions based on information learned through discovery.

89.    Certification of Plaintiffs' claims for class-wide treatment is appropriate because Plaintiffs can prove the elements of their claims on a class-wide basis using the same evidence as would be used to prove those elements in individual actions alleging the same claim.

90.    This action has been brought and may be properly maintained on behalf of each of the Classes proposed herein under Federal Rule of Civil Procedure 23.

91.    **Numerosity.** Federal Rule of Civil Procedure 23(a)(1): The members of the Classes are so numerous and geographically dispersed that individual joinder of all Class members is impracticable. While Plaintiffs are informed and believe that there are hundreds of thousands of members of the Class due to widespread sales of Class Vehicles nationwide, the precise number of Class members is unknown to Plaintiffs but may be ascertained from the Defendants' books and records. Class members may

CLASS ACTION COMPLAINT

be notified of the pendency of this action by recognized, Court-approved notice dissemination methods, which may include U.S. Mail, electronic mail, Internet postings, and/or published notice. Plaintiffs believe, and on that basis allege, that hundreds of thousands of Class Vehicles have been sold and leased nationwide.

92.   **Commonality and Predominance.** Federal Rule of Civil Procedure 23(a)(2) & (b)(3): This action involves common questions of law and fact that predominate over any questions affecting individual Class members, including, without limitation:

a.   Whether Defendants engaged in the conduct alleged herein;

b.   Whether Defendants designed, advertised, marketed, distributed, leased, sold, or otherwise placed the Class Vehicles into the stream of commerce in the United States;

c.   Whether the Class Vehicles have and were sold with the Engine Defect;

d.   Whether a reasonable consumer would consider the Engine Defect or its consequences to be material;

e.   Whether the Engine Defect is a safety defect;

f.   Whether Defendants knew of the Engine Defect but failed to disclose the problem and its consequences to consumers;

g.   When Defendants discovered the Engine Defect, and what, if anything, they did in response;

h.   Whether Defendants' conduct violates the California Legal Remedies Act, California Unfair Competition Law, California False Advertising Law, the Song-Beverly Act, and any other statutes asserted herein;

i.   Whether Plaintiffs and Class members overpaid for their Class Vehicles;

- 31 -
010789-11/1426138 V1

j.      Whether Plaintiffs and Class members experienced out-of-pocket losses as a result of the Engine Defect, and if so, how much; and

k.      Whether Plaintiffs and Class members are entitled to damages and other monetary relief and, if so, in what amount.

93.     **Typicality.** Federal Rule of Civil Procedure 23(a)(3): Plaintiffs' claims and Defendants' defenses thereto are typical of those of the Class members because, among other things, all Class members were comparably injured by Defendants' wrongful conduct described herein.

94.     **Adequacy.** Federal Rule of Civil Procedure 23(a)(4): Plaintiffs and their counsel are adequate because their interests do not conflict with the interests of the Class members they seek to represent; Plaintiffs have retained counsel competent and experienced in complex class action litigation; and Plaintiffs intend to prosecute this action vigorously. Plaintiffs and their counsel will fairly and adequately protect the Class members' interests.

95.     **Superiority.** Federal Rule of Civil Procedure 23(b)(3): A class action is superior to any other available means for the fair and efficient adjudication of this controversy and no unusual difficulties are likely to be encountered in the management of this class action. The damages or other financial detriment suffered by Plaintiffs and Class members are relatively small compared to the burden and expense that would be required to individually litigate their claims against Defendants, so it would be impracticable for Class members to individually seek redress for Defendants' wrongful conduct. Even if Class members could afford individual litigation, the court system could not. Individualized litigation creates a potential for inconsistent or contradictory judgments and increases the delay and expense to all parties and the court system. By contrast, the class action device presents far fewer management difficulties and provides the benefits of single adjudication, economy of

- 32 -

scale, and comprehensive supervision by a single court. On information and belief, Class members can be readily identified and notified based on, *inter alia*, Defendants' vehicle identification numbers, warranty claims, registration records, and database of complaints.

96.    Defendants have acted, and refused to act, on grounds generally applicable to the Classes, thereby making appropriate final equitable relief with respect to the Classes as a whole.

## VI.    TOLLING OF STATUTES OF LIMITATIONS

### A.    Discovery Rule Tolling

97.    Plaintiffs and Class members had no way of knowing about Defendants' deception with respect to the Engine Defect.

98.    Within the time period of any applicable statutes of limitation, Plaintiffs and Class members could not have discovered through the exercise of reasonable diligence that Defendants were concealing the Engine Defect and misconduct complained of herein, or that Defendants were misrepresenting their true position with respect to the Engine Defect.

99.    Plaintiffs and Class members did not discover, and did not know of, facts that would have caused a reasonable person to suspect that Defendants had concealed information about the Engine Defect in the Class Vehicles, which Plaintiffs discovered shortly before filing this action.

100.    For these reasons, the discovery rule tolls all applicable statutes of limitation with respect to claims as to the Class Vehicles.

### B.    Fraudulent Concealment Tolling

101.    Defendants concealed the Engine Defect, minimized the scope, cause, and dangers of the Engine Defect with inadequate recalls and purported remedies, and refused to investigate, address, and remedy the Engine Defect as it pertains to all Class Vehicles.

CLASS ACTION COMPLAINT

102.   Based on the foregoing, Defendants' knowing and active fraudulent concealment and denial of the facts alleged herein throughout the relevant period toll all applicable statutes of limitation.

**C.      Estoppel**

103.   Defendants were under a continuous duty to disclose to Plaintiffs and Class members the true character, quality, and nature of the Engine Defect, and the inevitable repairs, costs, time, and monetary damage resulting from the Engine Defect.

104.   Based on the foregoing, Defendants are estopped from relying on any statutes of limitations in defense of this action.

## VII.   CALIFORNIA LAW APPLIES TO THE CLAIMS OF THE NATIONWIDE CLASS

105.   California law applies to the nationwide claims because California's interest in this litigation exceeds that of any other state.

106.   Defendant HMA is headquartered in Fountain Valley, California, and is the sole entity in the United States responsible for distributing, selling, leasing, and warranting Hyundai vehicles, including the Hyundai Class Vehicles.

107.   Defendant KMA is headquartered in Irvine, California and is the sole entity in the United States responsible for distributing, selling, leasing, and warranting Kia vehicles, including the Kia Class Vehicles.

108.   Defendants each maintain their customer relations, engineering, marketing, and warranty departments at their corporate headquarters in this judicial district. Defendants' customer relations department is responsible for fielding customer complaints and monitoring customer complaints posted to their respective websites or third-party websites.

109.   Defendants' warranty and engineering departments are responsible for the decisions to conceal the Engine Defect from the Class members.

110.   Based on the foregoing, Defendants' policies, practices, acts, and omissions giving rise to Plaintiffs' and Class members' claims were developed in, and

- 34 -

emanated from, Defendants' headquarters in this judicial district in California. As detailed herein, Defendants knew or should have known about the Engine Defect through the activities of their divisions and affiliated entities located within California. Accordingly, the State of California has the most significant relationship to this litigation and its law should govern.

## VIII.  CLAIMS ALLEGED

## FIRST CAUSE OF ACTION

### VIOLATIONS OF CALIFORNIA'S CONSUMER LEGAL REMEDIES ACT ("CLRA") (CAL. CIV. CODE § 1750, *ET SEQ.*)
**(on behalf of the Nationwide Class or, alternatively, the California Class)**

111.   Plaintiffs and the Class members incorporate by reference all paragraphs as though fully set forth herein.

112.   Plaintiffs bring this claim on behalf of themselves and the Nationwide Class against Defendants. Alternatively, Plaintiffs Nicole Thornhill and David Shapiro bring this claim on behalf of themselves and the California Class against Defendants.

113.   Defendants are persons as defined in California Civil Code § 1761(c).

114.   Plaintiffs and the Class members are "consumers" as defined in California Civil Code §1761(d).

115.   Defendants engaged in unfair and deceptive acts in violation of the CLRA through the practices described herein, and by knowingly and intentionally concealing the Engine Defect in the Class Vehicles from Plaintiffs and Class members, along with concealing the risks, costs, and monetary damage resulting from the Engine Defect. These acts and practices violate, at a minimum, the following sections of the CLRA:

- (a)(2) Misrepresenting the source, sponsorship, approval, or certification of goods or services;
- (a)(5) Representing that goods or services have sponsorships, characteristics, uses, benefits, or quantities which they do not have,

- 35 -
CLASS ACTION COMPLAINT

or that a person has a sponsorship, approval, status, affiliation, or connection which he or she does not have;

- (a)(7) Representing that goods or services are of a particular standard, quality, or grade, or that goods are of a particular style or model, if they are of another; and

- (a)(9) Advertising goods and services with the intent not to sell them as advertised.

116.   Defendants' unfair and deceptive acts or practices occurred repeatedly in Defendants' trade or business, were capable of deceiving a substantial portion of the purchasing public, and imposed a serious safety risk on the public.

117.   Defendants knew the Class Vehicles' engines were defectively designed or manufactured, would fail prematurely, were prone to cause fires, and were not suitable for their intended use.

118.   Defendants had a duty to Plaintiffs and Class members to disclose the defective nature of the Class Vehicles' engines because:

a.      Defendants were in a superior position to know the true state of facts about the Engine Defect and associated repair costs in the Class Vehicles and their engines;

b.      Plaintiffs and Class members could not reasonably have been expected to learn or discover that the Class Vehicles and their engines had a dangerous safety defect until manifestation of the Engine Defect; and

c.      Defendants knew that Plaintiffs and Class members could not reasonably have been expected to learn or discover the Engine Defect and the associated repair costs until manifestation of the Engine Defect.

119.   In failing to disclose the Engine Defect and the associated safety risks and repair costs that result from it, Defendants have knowingly and intentionally concealed material facts and breached their duty to disclose.

- 36 -
CLASS ACTION COMPLAINT

120.    The facts concealed or not disclosed by Defendants to Plaintiffs and Class members are material in that a reasonable consumer would have considered them important in deciding whether to purchase the Class Vehicles or to pay a lesser price. Had Plaintiffs and the Class members known about the defective nature of the Class Vehicles and their engines, they would not have purchased or leased the Class Vehicles or would have paid less for them.

121.    On or about March 12, 2021, Plaintiffs, through undersigned counsel, provided Defendants written notice of their violations of the CLRA under California Civil Code § 1782(a) regarding the Class Vehicles.

122.    Plaintiffs and Class members' injuries were proximately caused by Defendants' fraudulent and deceptive business practices.

123.    Plaintiffs and the Class members seek all relief available under the CLRA.

## SECOND CAUSE OF ACTION

**VIOLATIONS OF THE CALIFORNIA UNFAIR COMPETITION LAW**
**(CAL. BUS. & PROF. CODE § 17200)**
**(on behalf of the Nationwide Class or, alternatively, the California Class)**

124.    Plaintiffs and the Class members incorporate by reference all paragraphs as though fully set forth herein.

125.    Plaintiffs bring this claim on behalf of themselves and the Nationwide Class against Defendants. Alternatively, Plaintiffs Nicole Thornhill and David Shapiro bring this claim on behalf of themselves and the California Class against Defendants.

126.    The California Unfair Competition Law ("UCL") prohibits acts of "unfair competition," including any "unlawful, unfair or fraudulent business act or practice" and "unfair, deceptive, untrue or misleading advertising." Cal. Bus. & Prof. Code § 17200.

127.    Defendants engaged in unfair competition and unfair, unlawful or fraudulent business practices through the conduct, statements, and omissions described

- 37 -
CLASS ACTION COMPLAINT

herein, and by knowingly and intentionally concealing the Engine Defect in the Class Vehicles from Plaintiffs and Class members, along with concealing the risks, costs, and monetary damage resulting from the Engine Defect. Defendants should have disclosed this information because they were in a superior position to know the true facts related to the Engine Defect, and Plaintiffs and Class members could not reasonably be expected to learn or discover the true facts related to the Engine Defect.

128.   The Engine Defect causing catastrophic engine failure and fire in the Class Vehicles constitutes a safety issue that triggered Defendants' duty to disclose the safety issue to consumers.

129.   Defendants' acts and practices have deceived Plaintiffs and are likely to deceive the public. In failing to disclose the Engine Defect and suppressing other material facts from Plaintiffs and Class members, Defendants breached their duties to disclose these facts, violated the UCL, and caused injuries to Plaintiffs and Class members. Defendants' omissions and concealment pertained to information that was material to Plaintiffs and Class members, as it would have been to all reasonable consumers.

130.   The injuries suffered by Plaintiffs and Class members are not greatly outweighed by any potential countervailing benefit to consumers or to competition, nor are they injuries that Plaintiffs and Class members should have reasonably avoided.

131.   Defendants' acts and practices are unlawful because they violate California Civil Code §§ 1668, 1709, 1710, and 1750, *et seq.*, and California Commercial Code § 2313.

132.   Plaintiffs seek to enjoin further unlawful, unfair, and/or fraudulent acts or practices by Defendants, to obtain restitutionary disgorgement of all monies and revenues generated as a result of such practices, and all other relief allowed under California Business & Professions Code § 17200.

- 38 -
CLASS ACTION COMPLAINT

## THIRD CAUSE OF ACTION

### VIOLATION OF CALIFORNIA FALSE ADVERTISING LAW
#### (CAL. BUS. & PROF. CODE § 17500, *ET SEQ.*)
### (on behalf of the Nationwide Class or, alternatively, the California Class)

133.   Plaintiffs and the Class members incorporate by reference all paragraphs as though fully set forth herein.

134.   Plaintiffs bring this claim on behalf of themselves and the Nationwide Class against Defendants. Alternatively, Plaintiffs Nicole Thornhill and David Shapiro bring this claim on behalf of themselves and the California Class against Defendants.

135.   California Business & Professions Code § 17500 states: "It is unlawful for any . . . corporation . . . with intent directly or indirectly to dispose of real or personal property . . . to induce the public to enter into any obligation relating thereto, to make or disseminate or cause to be made or disseminated . . . from this state before the public in any state, in any newspaper or other publication, or any advertising device, . . . or in any other manner or means whatever, including over the Internet, any statement . . . which is untrue or misleading, and which is known, or which by the exercise of reasonable care should be known, to be untrue or misleading."

136.   Defendants caused to be made or disseminated through California and the United States, through advertising, marketing and other publications, statements that were untrue or misleading, and which were known, or which by the exercise of reasonable care should have been known to Defendants, to be untrue and misleading to consumers, including Plaintiffs and the Class members.

137.   Defendants violated section 17500 because their misrepresentations and omissions regarding the safety, reliability, and functionality of the Class Vehicles as described herein were material and likely to deceive a reasonable consumer.

138.   Plaintiffs and Class members have suffered an injury in fact, including the loss of money or property, because of Defendants' unfair, unlawful, and/or deceptive practices. In purchasing or leasing their Class Vehicles, Plaintiffs and the

010789-11/1426138 V1

Class members relied on the misrepresentations and/or omissions of Defendants with respect to the safety and reliability of the Class Vehicles. Defendants' representations and/or omissions were untrue because the Class Vehicles are distributed with a defective engine. Had Plaintiffs and the Class members known this, they would not have purchased or leased their Class Vehicles or paid as much for them. Accordingly, Plaintiffs and the Class members overpaid for their Class Vehicles and did not receive the benefit of their bargain.

139.   All of the wrongful conduct alleged herein occurred, and continues to occur, in the conduct of Defendants' businesses. Defendants' wrongful conduct is part of a pattern or generalized course of conduct that is still perpetuated and repeated, both in California and nationwide.

140.   Plaintiffs, individually and on behalf of the Class members, request this Court enter such orders or judgments as necessary to enjoin Defendants from continuing their unfair, unlawful, and/or deceptive practices, to restore to Plaintiffs and the Class members any money Defendants acquired by unfair competition, including restitution and/or restitutionary disgorgement, and for such other relief permitted.

## FOURTH CAUSE OF ACTION

### VIOLATION OF THE SONG-BEVERLY ACT – BREACH OF IMPLIED WARRANTY (CAL. CIV. CODE §§ 1792, 1791.1, *ET SEQ.*) (on behalf of the Nationwide class or, alternatively, the California Class)

141.   Plaintiffs and the Classes incorporate by reference all paragraphs as though fully set forth herein.

142.   Plaintiffs bring this claim on behalf of themselves and the Nationwide Class against Defendants. Alternatively, Plaintiffs Nicole Thornhill and David Shapiro bring this claim on behalf of themselves and the California Class against Defendants.

CLASS ACTION COMPLAINT

010789-11/1426138 V1

143.   At all relevant times hereto, Defendants were the manufacturer, distributor, warrantor, and/or seller of the Class Vehicles. Defendants knew or should have known the specific use for which the Class Vehicles were purchased.

144.   Defendants provided Plaintiffs and Class members with an implied warranty that the Class Vehicles, and any parts thereof, are merchantable and fit for the ordinary purposes for which they were sold. The Class Vehicles, however, are not fit for their ordinary purpose because, *inter alia*, the Class Vehicles contained an inherent defect at the time of sale that causes the Class Vehicles to experience premature and catastrophic engine failure and fire.

145.   The Class Vehicles are not fit for the purpose of providing safe and reliable transportation because of the Engine Defect.

146.   Defendants impliedly warranted that the Class Vehicles were of merchantable quality and fit for such use. This implied warranty included, *inter alia*, the following: (i) a warranty that the Class Vehicles and engines manufactured, supplied, distributed, and sold by Defendants were safe and reliable for providing transportation and would not prematurely and catastrophically fail or catch fire; and (ii) a warranty that the Class Vehicles and their engines would be fit for their intended use–providing safe and reliable transportation–while the Class Vehicles were operated.

147.   Contrary to the applicable implied warranties, the Class Vehicles and their engines at the time of sale and thereafter were not fit for their ordinary and intended purpose. Instead, the Class Vehicles are defective, including, but not limited to, the Engine Defect and/or manufacturing of the GDI and MPI engines.

148.   Defendants' actions, as described herein, breached the implied warranty that the Class Vehicles were of merchantable quality and fit for such use in violation of California Civil Code §§ 1792 and 1791.1.

CLASS ACTION COMPLAINT

1

### IX.    REQUEST FOR RELIEF

2       WHEREFORE, Plaintiffs, individually and on behalf of members of the

3   Nationwide and California State Classes, respectfully request that the Court enter

4   judgment in their favor and against the Defendants, as follows:

5       A.    Certification of the proposed Nationwide and California State

6   Classes, including appointment of Plaintiffs as class representatives and appointment

7   of Plaintiffs' counsel as Class Counsel;

8       B.    Damages, including actual, compensatory, general, special,

9   incidental, statutory, punitive, and consequential damages, costs, and disgorgement in

10  an amount to be determined at trial;

11      C.    An order requiring Defendants to pay both pre- and post-judgment

12  interest on any amounts awarded;

13      D.    Grant appropriate injunctive and/or declaratory relief, including,

14  without limitation, an order requiring Defendants to repair, recall, and/or replace the

15  Class vehicles or, at a minimum, to provide Plaintiffs and Class members with

16  appropriate curative notice regarding the existence and cause of the Engine Defect;

17      E.    An award of reasonable costs and attorney fees; and

18      F.    Such other or further relief as may be appropriate.

19              ### X.    DEMAND FOR JURY TRIAL

20      Plaintiffs hereby demand a jury trial for all claims so triable.

21

22  Dated: March 12, 2021                    Respectfully submitted by,

23                                           HAGENS BERMAN SOBOL SHAPIRO LLP

24                                           By:  */s/ Christopher R. Pitoun*
                                                 Christopher R. Pitoun
25                                           301 N. Lake Avenue, Suite 920
                                             Pasadena, CA 91101
26                                           Tel.: (213) 330-7150
                                             Fax: (213) 330-7152
27                                           christopherp@hbsslaw.com

28

- 42 -

CLASS ACTION COMPLAINT

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

Steve W. Berman (*pro hac vice* to be filed)
HAGENS BERMAN SOBOL SHAPIRO LLP
1301 Second Avenue, Suite 2000
Seattle, WA 98101
Tel.: (206) 623-7292
Fax: (206) 623-0594
steve@hbsslaw.com

Rachel E. Fitzpatrick (*pro hac vice* to be filed)
HAGENS BERMAN SOBOL SHAPIRO LLP
11 W. Jefferson St., Suite 1000
Phoenix, AZ 85003
Tel.: (602) 840-5900
Fax: (602) 840-3012
rachelf@hbsslaw.com

*Attorneys for Plaintiffs*

CLASS ACTION COMPLAINT

010789-11/1426138 V1